IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Cynthia C. Price, | C/A No.: 5:20-3163-KDW |
| Plaintiff, | |
| v. | ORDER |
| Kilolo Kijakazi, Acting Commissioner of the Social Security Administration,[1] | |
| Defendant. | |

      This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("Act"). Having carefully considered the parties' submissions and the applicable law, the court reverses and remands the Commissioner's decision for the reasons discussed herein.

I.    Relevant Background

    A.    Procedural History

      On February 28, 2018, Plaintiff protectively filed for SSI and DIB under Title II of the Act alleging she became disabled on September 17, 2017. Tr. 209–14. After being denied initially, Tr. 80, 94, and upon reconsideration, Tr. 112, 128, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 153–54. The ALJ conducted a hearing on October 3, 2019.

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Kilolo Kijakazi for Andrew Saul as Defendant in this action.

Tr. 34–66. The ALJ denied Plaintiff's claim in a decision dated December 12, 2019. Tr. 12–33. Plaintiff requested review of this decision from the Appeals Council, Tr. 206–208, which denied her request on July 8, 2020, Tr. 1–5, making the ALJ's December 2019 decision the Commissioner's final decision for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed September 3, 2020. ECF No. 1.

      B.      Plaintiff's Background

Plaintiff was born on December 7, 1960, and was 56 years and 9 months old on her date last insured of June 30, 2019. Tr. 67. In her March 12, 2018 Disability Report-Adult, Plaintiff indicated she completed her GED in 1997, did not attend special education classes, and she completed a certified nursing assistant ("CNA") training in May 2017. Tr. 344. She listed her past relevant work ("PRW") as an assembler, a substitute cafeteria worker, a cashier, a CNA, and janitor/housekeeper. Tr. 345. Plaintiff indicated she stopped working on February 23, 2018, due to her medical conditions, but her conditions caused her to make changes in her work activity on September 17, 2017. Tr. 344. Plaintiff listed her medical conditions as heart attack with stent placement – small blockage remaining in the heart, fatty liver disease, anxiety, gout, mid-to-lower back stenosis, bulging discs in mid to lower back, degenerative disc disease in neck, necrobiosis lipoidica diabeticorum, and heart murmur. Tr. 343. Plaintiff indicated she was 5'7", weighed 215 pounds, and her conditions caused her pain or other symptoms. *Id.*

      C.      Administrative Proceedings

On October 3, 2019, Plaintiff appeared with her counsel at an administrative hearing in Greenwood, South Carolina and testified regarding her application for SSI and DIB. Tr. 37.

Vocational Expert ("VE") Robert Brabham also appeared by telephone and testified at the hearing. Tr. 38.

1. Plaintiff's Testimony

In response to questions from the ALJ, Plaintiff stated she was 58 years old, completed the ninth grade in school and obtained her GED. Tr. 39. Plaintiff testified she is right-handed, and she lives alone. *Id*. Plaintiff stated she last worked in February 24, 2018, and her daughter gives her money for her living expenses. Tr. 39–40.

In response to questions from her attorney, Plaintiff stated she currently weighed 220 pounds, but when she was working she weighed closer to 200. Tr. 40. Plaintiff testified she gained weight because of inactivity, low energy, and pain. Tr. 41. Plaintiff said she has a driver's license and she drives two to three times a week whenever she feels up to it. *Id*. Plaintiff testified she sometimes picks up her grandchildren from school or goes to the grocery store or the doctor. *Id*. Plaintiff stated she last worked as a cafeteria worker for six months until she had a heart attack. *Id*. Plaintiff said when she worked at the cafeteria she was in excruciating pain from her neck to her feet and she had to sit down to get relief. Tr. 42. Plaintiff stated she worked as a CNA prior to working in the cafeteria *Id*. Plaintiff said she left her job because she was having back problems and she could not perform the job to the "best of, you know, what they needed." *Id*. Plaintiff testified she did not have back problems when she did her assembler job. Tr. 44. Plaintiff said her back problems did not become bad until she started her CNA job where she had to move patients to bathe them and the patients pulled on her. Tr. 44. Plaintiff said the CNA job was painful and she left to find something else for better pay. *Id*. Plaintiff testified she had a heart procedure and had two stents placed in the back, right side of her heart. *Id*. Plaintiff stated it is her pain, not her

heart problem, that is keeping her from work. *Id*. Plaintiff said she has pain in her neck, shoulders, and back that is so excruciating she cannot stand. Tr. 44–45. Plaintiff testified she has seen Dr. Kilburn, a neurosurgeon, about her back problems and he prescribed her Gabapentin to help with the pain. Tr. 45. Plaintiff said Dr. Kilburn stated surgery would help with the pain but he did not want to do surgery now because of her heart problems and the Plavix she is taking. Tr. 45–46. Plaintiff stated she also had some problems with depression in the past but she has never seen a psychiatrist and is not on any medication. Tr. 46. Plaintiff says she sleeps "on and off" because she wakes up during the night due to pain or numbness. Tr. 46–47. Plaintiff testified she falls asleep during the day because she does not have any energy. Tr. 47. Plaintiff said when she sits down it takes no time for her to fall asleep and she has to lie down. *Id*. Plaintiff stated after using her arms and shoulder for 15 to 20 minutes the pain sets in and then worsens. *Id*. Plaintiff testified she has weakness in her left arm and it starts hurting when she raises it. Tr. 47–48. Plaintiff said she can sit between 20 to 30 minutes and then she is moving from side to side trying to get comfortable, and she can stand 15 to 20 minutes and then she has to sit down to take the pressure off. Tr. 48. Plaintiff stated she spends 50 to 75% of the day reclined or lying down. Tr. 49. Plaintiff said she does not use a cane or walker, and she can walk about 100 or 200 feet before the pain prevents her from going any further, and she has to sit. *Id.* Plaintiff testified when she shops she usually uses an electric cart, and in the past she leaned on a buggy when she shopped but she cannot do that well anymore. *Id*. Plaintiff stated it is difficult to bend or stoop but she does not have a choice a lot of time so she does the best she can. *Id*. Plaintiff said if she can lift five pounds she is "doing good because it pulls" and is painful.  Tr. 49–50. Plaintiff testified that around the house she prepares meals, does light cleaning with her grandchildren's help who take out the trash, vacuum, and do a little mopping. Tr. 50. Plaintiff stated she uses a computer and plays games. *Id*.

4

Counsel asked Plaintiff if she could perform a job where she could sit and stand as she wanted and did not have to lift more than two pounds, for six to eight hours a day. Tr. 49–50. Plaintiff said she could not because of the pain. Tr. 51,

    The ALJ asked Plaintiff how she rated her pain on a scale of zero to ten, with zero being no pain and ten being pain that you have to go to the emergency room for treatment. *Id*. Plaintiff said her pain is eight a lot of the time, and it reaches ten when she is "trying to walk or do something at a distance," and then she has to sit. *Id*. Plaintiff stated she is in pain every day, all day, and her neck pain is an eight. Tr. 51–52. Plaintiff says she take Gabapentin, and sometimes Tylenol to relieve the pain. Tr. 52. Plaintiff testified she has not had any surgery other than a hysterectomy or stents, nor has she had any injections for her neck or back. *Id*. Plaintiff stated she sees Dr. Kumar every six months for her cardiac problems. *Id*. Plaintiff said she does a few dishes at a time, and takes a break, and then goes back to finish. *Id.* Plaintiff stated she goes to the laundromat, does her laundry, folds clothes, lightly sweeps, dusts a little, and cleans the bathroom and living room as best she can. Tr. 53. Plaintiff testified she sees friends, relatives, and family, uses Facebook, texts, rarely emails, researches on the internet, reads the Bible, watches television, and goes out to eat. Tr. 54–55.

    2.  VE's Testimony

    The ALJ questioned Plaintiff about her work at George Park Seed Company, and Plaintiff stated she initially worked in the greenhouse and then she moved to the warehouse. Tr. 56. Plaintiff testified that her work in the warehouse included driving a forklift, loading and unloading trucks, and keeping records. Tr. 56–57. Plaintiff stated she was a lead person at the warehouse where she made sure everyone was doing what they were supposed to, but she did not hire or fire or direct

their daily work activity. Tr. 57. Plaintiff also stated she worked at Fujifilm as an assembler lifting hundreds of pounds, and in the kiosk developing pictures . Tr. 57–58.

The VE identified Plaintiff's past work as greenhouse laborer, Dictionary of Occupational Titles ("DOT") number 405.687-014, SVP:2, heavy; warehouse supervisor, DOT number 929.137-022, SVP:7, light; warehouse worker, DOT number 922.687-058, SVP:2, medium; assembler, DOT number 706-684-018, SVP:2, medium; and forklift driver, DOT number 921-683-050, SVP:3, medium. Tr. 59–60.  The ALJ asked the VE to assume a hypothetical individual of the same age, educational background, and past work experience as Plaintiff with the following limitations:

> Please assume you're dealing with a hypothetical individual the same age as the claimant with the same educational background and past work experience. Further assume that this individual retains the capability of lifting 50 pounds occasionally, 25 pounds frequently, can stand six of eight hours, walk six of eight hours, and sit six of eight hours. Pushing and pulling in the upper extremities would be frequent, ropes, ladders, and scaffolds would be never, frequent ramps and stairs, frequent stooping, kneeling, crouching, and crawling, overhead reaching occasional, handling left upper extremity frequent, avoid concentrated exposure to temperature extremes, humidity, vibration, and hazards.

Tr. 60. The ALJ asked if such an individual could perform any of Plaintiff's PRW as actually or generally performed in the national economy. *Id*. The VE testified that PRW can still be performed both as actually performed and as generally performed. *Id*. The VE identified the following other jobs the hypothetical individual could perform: fabricator, DOT number 709.684-014, SVP:2, medium exertional level, approximately 600,000 in the national economy; packers, DOT number 920.587-018, SVP:2, unskilled, medium, approximately 400,000 in the national economy; machine tender, DOT number 616.685-058, SVP:2, medium, approximately 160,000 in the national economy. Tr. 61– 62. The VE confirmed that his testimony was consistent with the DOT in accordance with SSR 2000-4p. Tr. 62. The ALJ asked the VE how he knew how the overhead

6

reaching is done and how did he base the reduced numbers on this knowledge. *Id*. The VE said his answer was based on having supervised job placement for 20 years at the vocational rehab, and "untold numbers of job analyses on [his] own part, so it's based on 50 years' experience." *Id.* The ALJ asked the VE to do the following:

> With the exception of overhead reaching would you please review the occupations identified in response to my hypothetical and compare the DOT requirements with limitations in the hypothetical? Are there any conflicts apparent or otherwise?

Tr. 62–63. The VE replied that there were not any conflicts. Tr. 63.

In his second hypothetical the ALJ asked the VE to consider the same limitations as in the first hypothetical except the individual would have absences from the workstation on a daily basis the duration of which would be in the sole discretion of the hypothetical individual. The ALJ explained

> By way of illustration this individual may experience severe cervical and lumbar pain that would generate throughout the body on a daily basis where this individual because of her weight may experience periods of time with no energy which would result for this individual needing additional rest breaks other than ordinary rest breaks or just being away from the workstation because of the inability to concentrate because of pain. This could be hours one day, it could be an entire day. It would be in the sole discretion but it would occur on a daily basis. Would that affect your answers?

*Id*. The VE responded affirmatively explaining that this limitation would eliminate all the jobs he cited or jobs that he could suggest. Tr. 63–64.

Plaintiff's counsel asked the VE if there were any jobs for a person who needs the ability to recline or lay down during the day. Tr. 64. The VE responded this hypothetical would limit employment. *Id*. Plaintiff's counsel then asked whether an individual who could not sit or stand for six hours during a day would be able to do any of the jobs he mentioned. *Id*. The VE replied this hypothetical would eliminate all jobs. Tr. 65.

II.   Discussion

   A.   The ALJ's Findings

In his December 12, 2019 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2019.

2. The claimant has not engaged in substantial gainful activity since September 17, 2017, the alleged onset date (20 CFR 404.1571 *et seq*. and 416.971 *et seq*.).

3. The claimant had the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumber spine; myocardial infraction; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant can frequently push and pull with the upper extremity; never climb ladders, ropes, or scaffolds; frequently climb stairs and ramps, stoop, kneel, crouch, and crawl; frequently handle with her left upper extremity; occasionally reach overhead; must avoid concentrated exposure to temperature extremes, humidity, vibrations, and workplace hazards.

6. The claimant was capable of performing past relevant work as a greenhouse laborer, warehouse supervisor, warehouse worker, and assembler. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from September 17, 2017 through the date of this decision (20 CFR 404.1520(f) and 416.920(f))).

8

Tr. 15–27.

B.  Legal Framework

1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5) whether

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R.

9

the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if s/he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing an inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that s/he is

---

§ 404.1520(a)(4)(iii); § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the

11

Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    C.    Analysis

Plaintiff alleges the ALJ failed to (1) explain his findings regarding the Plaintiff's residual functional capacity, as required by Social Security Rulings 96-8p; (2) properly consider the evidence regarding Plaintiff's degenerative disc disease; and (3) evaluate the subjective symptomology of Plaintiff. ECF No. 23 at 12–26.

    1.    RFC Narrative/ Degenerative Disc Disease

Plaintiff argues the ALJ did not explain his RFC findings, failed to perform the proper function-by-function analysis, and failed to properly consider the evidence concerning Plaintiff's degenerative disc disease. ECF No. 23 at 12–19. The Commissioner contends the RFC is supported by substantial evidence and the ALJ properly considered Plaintiff's heart impairment and degenerative disc disease and determined Plaintiff could perform a reduced range of medium work. ECF No. 25 at 8–14.

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). In formulating the RFC, the ALJ is to consider all impairments, even those that are not severe, "and revie[w] 'all relevant medical and other evidence.'" *Jackson v. Berryhill*, 2017 WL 685603, at *6 (E.D.N.C. Jan. 23, 2017). The ALJ must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Monroe v. Colvin*, 826 F.3d 176, 187–88 (4th Cir. 2016). The ALJ "must also explain how any material inconsistencies or

ambiguities in the evidence in the case record were considered and resolved." SSR 96–8, *7. The RFC must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts such as laboratory findings and non-medical evidence like daily activities and observations. *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). However, there is no particular language or format the narrative discussion must follow as long as it permits meaningful judicial review. *Monroe v. Colvin*, 826 F.3d at 189. Additionally, "'a necessary predicate to engaging in a substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.'" *Monroe v. Colvin*, 826 F.3d at 189. "[I]n evaluating the effect[] of various impairments . . . , the [ALJ] must consider the combined effect of a claimant's impairments and not fragmentize them." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The ALJ considers the evidence in the record as a whole when analyzing Plaintiff's claims, as does this court when reviewing the ALJ's decision. *See Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996).

In devising the RFC, the ALJ found Plaintiff's severe impairments included degenerative disc disease of the cervical, thoracic, and lumbar spine, myocardial infraction, and obesity. Tr. 17. The ALJ refenced Plaintiff's statements and her reported symptoms, the objective medical findings, examining and treating physicians' records, and consultive examiners opinions. Tr. 20–23. The ALJ found Plaintiff had the RFC to perform medium work with certain exertional and postural limitations. Tr. 20. The RFC limited Plaintiff as follows

> frequently push and pull with the upper extremity; never climb ladders, ropes, or scaffolds; frequently climb stairs and ramps, stoop, kneel, crouch, and crawl, frequently handle with her left upper extremity; occasionally reach overhead; must avoid concentrated exposure to temperature extremes, humidity, vibrations, and workplace hazards.

*Id.*

Plaintiff argues the ALJ failed to consider evidence that documented she had more than mild degenerative disc disease when determining the RFC. ECF No. 23 at 14–19.

As part of his RFC assessment the ALJ referenced statements from Plaintiff's Adult Function Report that she had pain in her neck, back, and feet that brought tears to her eyes; that she could not lift things needed to do work or grasp well with her left hands making it difficult to open a jar; that the pain in her neck, back, and feet limited her ability to lift, squat, walk, bend, stand, reach, sit, kneel, and climb stairs. Tr. 21. The ALJ found Plaintiff's impairments could be expected to cause the reported symptoms, but the persistence, intensity, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record. *Id.*

The ALJ then summarized Plaintiff's medical history. The following records were cited in reference to Plaintiff's cervical, thoracic, and lumber spine: In September 2017, Plaintiff reported a motor vehicle accident, and a radiograph of Plaintiff's thoracic spine revealed no evidence of fracture, and subtle dextroconvex curvature with moderate spondylosis. Tr. 22. A radiograph of cervical spine showed mild degenerative disc disease. *Id*. A radiograph of her lumber spine showed mild multilevel disc narrowing and spondylosis. *Id*. A physical exam revealed no gait problems. *Id.*

In November and December 2017, Plaintiff presented with back pain and an MRI of her lumbar spine revealed only mild disc disease. *Id*. Physical exam showed a normal range of motion in her neck, and no edema or tenderness in her musculoskeletal system. *Id.*

In March 2018, an examination showed Plaintiff's gait and station were normal, her head and neck had normal range of motion, and sensory was intact. Tr. 21. Plaintiff reported numbness

in her left arm, however, an EKG was unremarkable and treatment notes indicated there was low suspicion for acute coronary process causing left arm numbness. *Id.*

In April 2018, Plaintiff reported left arm pain and fatigue. *Id*. Physical exams were normal, with normal range of motion, no sensory of motor deficits, and 5/5 motor strength in upper extremities. *Id.*

In May 2018, an MRI of Plaintiff's cervical spine revealed degenerative disc changes, and broad based disc osteophyte. Tr. 22.

From May 2018 through September 2018, medical records showed physical exams were normal, with normal range of motion in her neck and musculoskeletal system, with no motor deficits, no sensory deficits, no cervical adenopathy, reflexes were within normal limits, no edema or tenderness, sensory was intact, and normal muscle tones. *Id*. Plaintiff's body mass index was over 30. *Id.* Plaintiff was treated with Gabapentin. *Id*.

The ALJ also considered Plaintiff's reported ADLs and the consultive examiner's opinion. Tr. 24. The ALJ explained Plaintiff could perform medium work, with some additional restrictions:

> In sum, the claimant received fairly conservative treatment for her physical impairments along with mostly normal results on numerous physical examinations. Moreover, imaging results due [sic] not suggest significantly limiting musculoskeletal issues, as they showed only mild pathology. Moreover, the claimant appears to have responded well to the cardiac catheterization and stent placement, as subsequent physical examinations and diagnostic testing related to her cardiovascular system have been mostly normal. Nevertheless, the claimant's severe physical impairments were considered in limiting the claimant to a reduced range of medium work along with the above mentioned postural, environmental, reaching, and fingering limitations. In establishing the residual functional capacity I considered the claimant's impairments individually and in combination I find that the combined effects of all of the claimant's impairments create synergies necessitating a more restrictive residual functional capacity than if considering the impairments individually. I find that the combined effects of all of the claimant's impairments set forth in section 3 above limit the claimant to lifting 50 pounds occasionally, 25 pounds frequently, stand, walk and sit six of eight hours each and frequently push and pull in the upper extremities. The

>claimant's cervical and thoracic impairment limit the claimant with respect to overhead reaching and handling. Based on the combined effects of the claimant's obesity and myocardial infarction the claimant was limited regarding temperature extremes, humidity, vibration and hazards. The postural restrictions were imposed based on the claimant's thoracic and lumbar spine impairments. In reaching these conclusions I considered the claimant's diagnostic tests, physical examinations, activities of daily living and conservative treatment. While the claimant reported constant lumbar and cervical pain ranging from 8 to 10 on a scale of 0 to 10 with zero being no pain and 10 being pain that would require emergency room treatmentthe evidence is inconsistent with her report of pain. Treatment records indicated no back pain or neck pain, no tenderness and no joint pain (Exhibits 21F, 16F, 13F, 12F, 8F and 1F). The claimant testified that she lays down 50 to 75% of the day which is facially inconsistent with treatment records indicating no malaise, fatigue and the claimant's condition is stable (Exhibits 21F 19F, 14F, 13F and 12F). Activities of daily living included cooking, doing laundry, folding clothing, sweeping, cleaning the bathroom, cleaning the kitchen, cleaning the living room, driving, and picking up the grandchildren from school. These extensive activities suggest the claimant is not as limited as alleged at the hearing.

Tr. 23.

Plaintiff contends her medical evidence shows she has more than mild degenerative disc disease. ECF No. 23 at 14–19. Plaintiff argues the ALJ failed to consider MRI evidence describing a worsening condition, citing to an April 5, 2017 and a May 21, 2018 MRI of the cervical spine. *Id.* at 14.

The Commissioner argues the ALJ thoroughly considered and explained how he accounted for Plaintiff's spinal impairments. ECF No. 25 at 11. Addressing Plaintiff's issues with the use of the word "mild," the Commissioner cites to Dr. Corlette's opinion, explaining Dr. Corlette noted moderate cervical spine spondylosis with cord impairment and associated pain, and opined Plaintiff could perform medium work with postural and manipulative limitations. *Id*. The Commissioner contends the ALJ found the opinion persuasive, and included these limitations in the RFC. *Id*. at 11–12. The Commissioner claims the ALJ did not ignore the May 2018 MRI as he cited this evidence in his order. *Id*. at 12–13. The Commissioner also contends the ALJ cited Exhibit 11F at 4, which is the record showing Dr. Kilburn's notation that the MRI showed

degenerative changes. *Id.* at 13. The Commissioner then notes the April 5, 2017 MRI was taken before the alleged onset date. *Id.*

In his RFC discussion, the ALJ does not reference the April 5, 2017 MRI. The ALJ references Plaintiff's May 2018 MRI noting only that the MRI revealed "degenerative disc changes, and broad-based disc osteophyte at C5-C6." Tr. 22. In his summation of the medical evidence, the ALJ stated that Plaintiff's imaging results showed only mild pathology and did not suggest significant musculoskeletal issues. Tr. 23.

Plaintiff's April 2017 MRI showed "multilevel degenerative disc disease, moderately advanced from C4/C5 though C6/C7." Tr. 813.[3] Plaintiff's May 15, 2018 MRI showed, in pertinent part:

- C7-T1 chronic degenerative grade 1 interval very subtle subluxation;

- Chronic encroachment upon the left C5-6 neural foramen secondary to chronic arthritic hypertrophy;

- Severe degenerative disc changes and uncovertebral arthrosis with scattered mild arthritis.

Tr. 1082–83. Although the ALJ referenced briefly Plaintiff's May 15, 2018 MRI, he did not acknowledge the language from the MRI report that Plaintiff's degenerative disc changes were chronic and severe. *See* Tr. 22. The ALJ also did not indicate how or whether he considered this portion of the May 2018 MRI.

Given the ALJ's lack of explanation related to his consideration of evidence that Plaintiff had more than mild pathology in determining Plaintiff's RFC, the court cannot determine if the

---

[3] Although the April 2017 MRI pre-dated Plaintiff's date of alleged disability onset, the regulations require the Commissioner to consider the evidence if it is made part of the record. C*otton v. Colvin*, No. 5:14-CV-425-FL, 2015 WL 5714912, at *3 (E.D.N.C. Sept. 29, 2015)

17

RFC is supported by substantial evidence. In formulating the RFC, the ALJ is required to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96–8, *7. Without an adequate RFC explanation, the court cannot conduct a meaningful review of the ALJ's decision. Accordingly, remand is necessary. *See Meyer v. Astrue*, 662 F.3d 700, 707 (4th Cir. 2011) ("Assessing the probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance.").

Because the court is remanding this matter for the ALJ to consider all the evidence in the record concerning the impact Plaintiff's degenerative disc disease has on Plaintiff's RFC, the ALJ should also use this opportunity to re-evaluate the issues raised in Plaintiff's remaining claim, the evaluation of Plaintiff's subjective symptomology. Proper development of the record as set out above may have a significant impact on the Commissioner's determination of Plaintiff's RFC, subjective symptom evaluation, and the availability of work for Plaintiff in the national economy.

### III.   Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine if the Commissioner's decision is supported by substantial evidence. The court hereby reverses the decision of the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g) and remands the matter to the Commissioner for further proceedings consistent with this order.

IT IS SO ORDERED.

March 3, 2022                                                                                  Kaymani D. West
Florence, South Carolina                                                              United States Magistrate Judge